# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Michael Afremov,                                      Civil No. 11-313 (SRN/SER)

       Plaintiff,

                                          **MEMORANDUM OPINION**
   v.                                                            **AND ORDER**

Artur Jarayan, and Object of Vertu, LLC,

       Defendants and
       Third-Party Plaintiffs,

   v.

John Atzbach,

       Third-Party Defendant.

---

Sandra K. Kensy, 5430 Carlson Road, St. Paul, MN 55126, for Plaintiff.

Anthony Gabor, Leonard B. Segal, and John D. Thompson, Oberman Thompson & Segal, LLC, One Financial Plaza, 120 South Sixth Street, Suite 1700, Minneapolis, MN 55402, for Defendants and Third Party-Plaintiffs.

Sandra K. Kensy, 5430 Carlson Road, St. Paul, MN 55126, for Third-Party Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

       This matter is before the Court on Plaintiff Michael Afremov's motion to dismiss certain of Defendants Artur Jarayan, and Object of Vertu, LLC's counterclaims, as well as the entirety of their third-party complaint (Doc. No. 33), and on Third-Party Defendant John Atzbach's motion to dismiss the third-party complaint (Doc. No. 36).  For the reasons stated below, this Court grants in part, denies in part, and denies as moot in part Plaintiff's motion, and denies Third-Party Defendant's motion to dismiss.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Afremov, a native of Russia and an avid collector of Russian artifacts, met

Jarayan, a dealer in such artifacts, in about 2005.  (Doc. No. 1, ¶ 9.)  Jarayan represented

that for a commission he could act as Afremov's agent in purchasing such artifacts.  (Id.)

Afremov alleges that Jarayan represented to him that he (Jarayan) was working solely on

Afremov's behalf.  (Id. ¶ 10.)  In the fall of 2007, Jarayan began working with Atzbach, a

dealer in Russian artifacts based in Redmond, Washington, to acquire artifacts for

Afremov.  (Doc. No. 27, ¶ 2, at 61.)

In 2008, Jarayan, an Armenian native, also mentioned to Afremov his interest in

opening a casino in Armenia.  (Doc. No. 1, ¶ 11.)  Jarayan represented that the purchase

of the land for the casino would be a *bona fide*, arms-length acquisition at a reasonable

price from a third party unrelated to Jarayan.  (Id. ¶ 12.)  Accordingly, Afremov paid

Jarayan $1,720,000 to acquire the land, and shortly thereafter, an additional $470,000 to

acquire an adjacent parcel Jarayan claimed was essential to the operation.  (Id. ¶¶ 15, 16.)

Afremov's attorney met with Jarayan in order to memorialize the parties'

agreement in a written contract.  (Id. ¶ 18.)  Jarayan informed Afremov's attorney that

Jarayan acquired the land solely in his own name.  Afremov agreed to provide the

additional $470,000 only if Jarayan agreed in writing that ownership of all of the acquired

land would be transferred as soon as possible to an entity to be jointly owned by Afremov

and Jarayan.  (Id. ¶ 19.)  In October 2008, the parties signed a contract, the "AM Plaza

Agreement," establishing AM Plaza, LLC, of which Afremov and Vertu would each own

fifty percent, with Jarayan designated as the Manager of the LLC.  (<u>Id.</u> ¶ 21.)

Although Jarayan acquired several parcels of property in Armenia, the casino project never got off the ground.  Afremov and Jarayan also had various disagreements regarding the Russian artifact transactions.  Accordingly, in February 2011, Afremov filed the present action against Jarayan and his company, Object of Vertu, LLC, regarding both the Armenian casino project and the artifact transactions.  (Doc. No. 1.)  Five of the seven claims concern the casino project and the remaining two concern the artifact transactions.

Defendants' Answer included not only Counterclaims against Afremov, but also a Third-Party Complaint against Atzbach, asserting eight claims regarding the artifact transactions.  (Doc. No. 22.)  In the interim, Defendants had moved to dismiss for insufficient service of process (Doc. No. 3), but soon withdrew that motion (Doc. No. 20).

Afremov then moved to dismiss certain of the Counterclaims as well as the Third-Party Complaint.  (Doc. No. 23.)  Atzbach too moved to dismiss the Third-Party Complaint.  (Doc. No. 25.)  In response, Defendants promptly filed their Amended Answer, Counterclaims and Amended Third-Party Complaint, which added an additional Third-Party Claim for "Contribution and Indemnification" to the eight claims originally included in their Third-Party Complaint.  (Doc. No. 27.)

Afremov then filed his present motion to dismiss many of the Counterclaims and the Third-Party Complaint.  Atzbach too filed his present motion to dismiss the Amended Third-Party Complaint.

## II.     DISCUSSION

Afremov has bundled together in a single action various claims against Defendants Jarayan and Object of Vertu.  He first asserts several claims against Defendants with respect to the casino they planned to build in Armenia.  Afremov also asserts essentially separate claims against Defendants with respect to an ongoing relationship between them regarding certain Russian artifacts Afremov purchased with Defendants' assistance.  With respect to those claims regarding the artifact transactions, Defendants have impleaded, under Rule 14, Atzbach as a Third-Party Defendant.  Although Atzbach also assisted Afremov in acquiring those artifacts (sometimes in conjunction with Defendants), Afremov has not brought suit against Atzbach.  In fact, the Complaint does not even mention Atzbach.

Moreover, Afremov, as well as Atzbach, move to dismiss the Third-Party Complaint(s) against Atzbach.  As Afremov argues, the purported Third-Party Complaint "alleges wholly separate and independent claims of Defendants against Atzbach, which are improperly included in Defendants' Counterclaim against Plaintiff."  (Doc. No. 34, at 23.)  Afremov thus contends that the action against Atzbach should be dismissed because "Defendants included numerous allegations in their Counterclaim that obviously relate only to their claims against Atzbach, and improperly attempted to join such claims in this action under the guise of a Third-Party Complaint."  (Id. at 25.)  Afremov thus also seeks to compel Defendants to provide a more definite statement as to which of their allegations "pertain to which named and un-named parties or entities," as well as to strike certain

allegations he contends are "redundant, immaterial, impertinent, or scandalous." (Doc. No. 33.) Atzbach too contends that Defendants' third-party claims against him are improper under Rule 14 because they are not related to Afremov's claims against Defendants. (Doc. No. 38.) Atzbach also contends that this Court lacks personal jurisdiction over him. (Id.)

**A.     Dismissal Standard**

On a motion to dismiss, the Court accepts as true the factual allegations of a complaint and draws all reasonable inferences in a plaintiff's favor, but it does not defer to any legal conclusions or formulaic recitations of the claims' elements. Minneapolis Firefighter Relief Ass'n v. MEMC Electronic Materials, Inc., 641 F.3d 1023, 1027 (8th Cir. 2011). Under Rule 12(b)(6), the Complaint "'must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009)). This standard also applies, of course, where a plaintiff challenges a defendant's counterclaims on a Rule 12 motion.

**B.     Defendants' Counter-Claims**

With respect to Defendants, Afremov moves (1) to dismiss certain counts of Defendants' Counter-Claims, (2) for a more definite statement as to which allegations pertain to whom, and (3) to strike certain parts of the Counterclaims. (Doc. No. 33.)[1]

---

[1]     That portion of Afremov's motion to dismiss directed at the original Third-Party Complaint will be addressed in conjunction with Atzbach's motion to dismiss the Amended Third-Party Complaint.

### 1.       Motion to Strike Certain Counter-Claims

Afremov seeks dismissal of certain of Defendants' Counterclaims, namely Count 1, part of Count 2 (that pertaining to the casino project), Count 5, and Counts 7 through 9.[2]

### (a)       Count One

Count One alleges that Afremov breached the AM Plaza Agreement, the contract Afremov and Defendants signed regarding the casino project.  The Agreement was entered in order to "regulate the affairs of the Company, the conduct of its business and the relations of its Members."  (Doc. No. 45, Ex. 3, at 1.)  Count One alleges five separate breaches of the Agreement that fall into two distinct categories: (1) that Afremov failed to make two separate capital contributions to AM Plaza (one for $5 million as his own contribution and one for $500,000 on behalf of Object of Vertu); and (2) that "AM Plaza" failed to pay three forms of compensation, benefits and expenses to Jarayan.  (Doc. No. 27, ¶ 251, at 49-50.)

With respect to the first category of alleged claims, those regarding capital contributions, Afremov argues that those two subclaims "belong to the AM Plaza [sic],

---

[2]       At the outset, the Court notes a largely unaddressed issue of choice-of-law with respect to the Counterclaims.  Apart from the fact that the written contract between Afremov and Defendants specifies that Delaware law shall govern the interpretation and construction of that contract, the parties, without raising any choice-of-law issue, rely variously on the state law of the forum, Minnesota, as well as on Delaware law.  It is not self-evident that the contractual choice-of-law provision also governs extra-contractual claims such as promissory estoppel.  In light of the lack of any express choice-of-law dispute or analysis, this Court will apply the law on which the parties rely to issues other than the interpretation and construction of the AM Plaza Agreement itself.

not Defendants individually," because the claims must be brought by the real party in interest and that Defendants have not alleged that Afremov agreed to be liable to them directly. (Doc. No. 34, at 5-6.)  Afremov further argues that Defendants have failed to follow the governing procedures for what is in effect a derivative suit.  (Id. at 6.)

In response, Defendants argue that they, not AM Plaza, are the proper parties to assert such claims because they bring such claims to enforce the AM Plaza Agreement, a contract to which they were signatories.  While Object of Vertu is a Member of the LLC, Jarayan personally is not (although he is the President and, apparently, the sole owner of Vertu).  Jarayan signed the Agreement on behalf of Vertu and also signed separately in his individual capacity as having "acknowledged and agreed" to the Agreement.  The Court thus agrees that Defendants are at least permissible parties to bring such claims.  See Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC, 2009 WL 1124451, *5-6 (Del. Ch. April 20, 2009) (noting signatories to LLC agreement agreed that breach of contract claims were valid).[3]

Even if the claims for unpaid capital contributions could be viewed as belonging to the entity to which such contributions should have been made, such an action here by the entity against the member who holds fifty of the fifty-five Class A units of membership would require that that Member sue himself.  Insofar as Afremov, on behalf of AM Plaza,

---

[3]      Afremov relies on the Delaware Limited Liability Act to contend that *only* the LLC may enforce a Member's capital contribution obligation.  (Doc. No. 34, at 5-6.) But Section 18-502 of that statute simply provides an LLC with the *additional* optional right to require that a member contribute cash where the member failed to contribute the property or services it had agreed to provide.  6 Del. C. 18-502(a).  It does not purport to preclude a contracting party's right to enforce contractual obligations.

would likely decline to initiate such an action, Jarayan could not initiate a derivative

action because he is not a Member of the LLC.  And although his company, Vertu, is such

a Member, such that it might be able to pursue a derivative action on behalf of the LLC,

any right to do so does not appear to restrict or eliminate Vertu's contractual right to sue

Afremov for breach of the Agreement.  Accordingly, the Court declines to dismiss that

portion of Count One.

　　　With respect to the second category of alleged breach-of-contract claims, those

regarding Jarayan's compensation, Afremov argues that those three subclaims–each of

which expressly attributes the failure to "AM Plaza" rather than to Afremov–may be

directed only at AM Plaza, not Afremov individually.  (Doc. No. 34, at 7.)  Afremov is

correct that the Agreement provides that AM Plaza, not Afremov personally, shall pay

Jarayan the types of compensation at issue.  (Doc. No. 45, Ex. 3, § 6.5 ("The Company

[defined as AM Plaza LLC] shall pay the Manager . . . ").)

　　　Defendants counter by arguing that "[w]hile it is true that AM Plaza would be the

entity that would pay Jarayan, the funds to operate AM Plaza and to make such payments

were to come solely from Afremov," such that "[a]s a consequential damage of

Afremov's breach" of his capital contribution obligations, "AM Plaza has not had the

funds to pay" Jarayan.  (Doc. No. 44, at 8.)  As a practical matter, Defendants are perhaps

in some sense correct that AM Plaza could not, at least in its initial phase of operations

before the casino could generate any revenue, pay Jarayan's compensation where it

lacked the initial operating capital that was to be provided by Afremov.  But as a matter

of law, the contract places the obligation to compensate Jarayan only on AM Plaza, and

the AM Plaza Agreement further provides that a Member such as Afremov generally is

not personally obligated for the debts and obligations of the LLC.  (Doc. No. 45, Ex. 3, §

10.1.)[4]  Although Defendants might be able to recover, as consequential damages, the

compensation allegedly owed Jarayan if they prevail on their contractual claims against

Afremov for failing to make his capital contributions, Defendants may not pursue, as

separate breach-of-contract subclaims, those claims as causes of action against Afremov

as opposed to AM Plaza.

In sum, with respect to Count One, the Court grants Afremov's motion to dismiss

insofar as it challenges the compensation subclaims, but denies it insofar as it challenges

the capital contribution subclaims.

### (b)   Count Two

The part of Count Two that alleges breach of an *oral* contract with respect to the

casino project asserts that Afremov "promised to capitalize the casino project," and to

"compensate Defendants for moving to Armenia, closing Defendants' businesses in the

United States, incurring costs on behalf of the casino project, and so on."  (Doc. No. 27, ¶

259, at 51.)  But the AM Plaza Agreement, which governs the rights and obligations of

the Members of AM Plaza LLC ("the Company"), provides that "[t]he Company shall

pay the Manager [Jarayan]" a salary and also "provide and pay for" certain benefits plus

"all reasonable costs of relocation to Armenia" and "such other items as are ordinarily

---

[4]       The Delaware LLC statute, as well, provides that a Member generally is not
personally liable for the company's debts or obligations.  6 Del. C. 18-303(a).

provided by international companies for their executives relocating to Armenia." (Doc.

No. 45, Ex. 3, § 6.5.)  Thus, the written contract entered into by the parties covers the

same general subject matter which Defendants now allege was covered by an oral

contract.  But it is a fundamental principle of contract law that prior oral agreements

merge into any subsequent written agreement and evidence of such agreements may not

be used to vary the express terms of the written agreement.  In fact, the AM Plaza

Agreement incorporates an express integration clause to this precise effect:

> The parties hereto agree that all understandings and agreements heretofore
> made between them are merged in this agreement, which alone fully and
> completely expresses their agreement with respect to the subject matter
> hereof.  There are no promises, agreements, conditions, understandings,
> warranties, or representations, oral or written, express or implied, among
> the parties hereto, other than as set forth in this Agreement.  All prior
> agreements among the parties are superseded by this Agreement, which
> integrates all promises, agreements, conditions and understandings among
> the parties with respect to the Company.

(Id., § 14.6.)  Thus, that portion of Count Two regarding an oral agreement governing the

casino project is dismissed.

### (c)    Count Seven

Likewise, the existence of the written AM Plaza contract–which Defendants not

only do not challenge, but on which they affirmatively rely–also precludes Count Seven,

alleging promissory estoppel.  Banbury v. Omnitrition Int'l, Inc., 533 N.W.2d 876, 880-

81 (Minn. App. 1995) (stating that "promissory estoppel claim must fail as a matter of

law" where "a contract did, in fact, exist"); UFE Inc. v. Methode Electronics, Inc., 808 F.

Supp. 1407, 1414-15 (D. Minn. 1992).[5]

### (d)    Count Five

The existence of a valid contract also precludes the bulk of Count Five, alleging a breach of a fiduciary duty, because five of the seven alleged breaches of fiduciary duty simply parallel the same alleged breaches of contract.  Where a valid written contract imposes certain obligations, claims that such obligations were not met are addressed in terms of a claim for breach of contract, not breach of a fiduciary duty.  E.g., Nemec v. Shrader, 991 A.2d 1120, 1129 (Del. 2010) ("It is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contact claim. . . . [A]ny fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous.").

With respect to the remaining two alleged breaches of fiduciary duty, each also is untenable as a matter of law.  Defendants allege that "Afremov falsely accused Jarayan of

---

[5]    Defendants argue that they are entitled to plead alternative theories.  (Doc. No. 44, at 10.)  True enough. Fed. R. Civ. P. 8(d)(3).  But the ability to plead in the alternative does not "absolve the pleader from honoring" the mandates of Rule 11, including that the allegations "have evidentiary support."  5 Wright and Miller, Federal Practice and Procedure § 1282, at 723-24 (3d ed. 2004).  Thus, where there is no express written contract, a party may assert claims for breach of both an *oral* contract and an implied contract as well as for promissory estoppel.  Eklund v. Vincent Brass and Aluminum Co., 351 N.W.2d 371, 373-78 (Minn. App. 1984) ("No written employment agreement was prepared.  There was no written correspondence confirming the employment terms.").  Accord Rognlien v. Carter, 443 N.W.2d 217, 219-20 (Minn. App. 1989) (permitting alternative claim of promissory estoppel in addition to claims for an oral contract where employee "was never given a written employment contract").  Here, however, not only is there no factual dispute that the parties entered into a valid written contract, Defendants premise Count One of their Counterclaims on that contract.  (E.g., Doc. No. 27, ¶ 196, at 40-41.)

fraud and inappropriate conduct related to the land acquisition." (Doc. No. 27, ¶ 285(f).) In essence, Defendants allege–as a counterclaim–that Afremov's claims against Defendants will fail. Although a defendant is, of course, free to oppose and defend against a plaintiff's claim, that defense does not itself constitute a separate counterclaim.

Finally, with respect to the last alleged breach of fiduciary duty, Defendants claim that "Afremov failed to have Armenian counsel create an Armenian subsidiary of AM Plaza so that title to the acquired land could be transferred from Jarayan to the subsidiary." (Doc. No. 27, ¶ 285(g).) But the Agreement places such obligations on the "Manager," that is, Jarayan, not Afremov. In general, "[t]he Manager shall be responsible for the day-to-day management and operation of the business and affairs of the Company." (Doc. No. 45, Ex. 3, § 6.3.) In particular, Jarayan covenanted that he "shall cause the title to the Armenian Properties to be transferred to the Company or a wholly-owned subsidiary of the Company." (Id. § 5.4(b).) Moreover, Jarayan represented and warranted that "Afremov has not participated in the conduct of the Company business, and Afremov has relied entirely on the Manager with respect to the conduct of the Company business in compliance with all applicable laws." (Id., § 5.2(d).) Defendants allege that Armenian law required that the properties Jarayan had acquired for the casino project be transferred to an Armenian company (Doc. No. 27, ¶ 198), which then presumably would be a subsidiary of AM Plaza. But again, Jarayan, as Manager, was responsible for compliance with all Armenian laws. (Doc. No. 45, Ex. 3, §§ 5.2(a), 5.3(a).) Defendants also allege that "Afremov and [his attorney] failed to provide

12

financing or take the needed steps to implement the property transfer." (Doc. No. 27, ¶ 198.)  But Defendants may not pursue, as a separate alleged breach of fiduciary duty, any claim that Afremov is responsible for Defendants' failure to transfer the properties on the grounds that Defendants' alleged failure is a consequence of Afremov having failed to make his requisite capital contribution.  Defendants already have asserted such a claim in terms of breach of contract.

**(e)      Counts Eight and Nine**

With respect to Count Eight, Defendants allege that Afremov converted certain items owned in part by Defendant Jarayan by purchasing the items from Atzbach, one of the other joint owners of the items, but paying Jarayan only in part while paying the other joint owners for their entire share of the items.  (Doc. No. 27, at 57-58.)  Defendants allege that "Afremov is in possession of these items, is aware that Defendants own a portion of the items, and has not given the items to Defendants or paid Defendants the fair value of Defendants' interest in the items."  (Id. ¶ 304, at 58.)

Afremov argues that Defendants fail to state a claim for conversion because they "have not alleged that Jarayan had the right to the use and possession of the items," or that "their one-third ownership interest in the property was taken."  (Doc. No. 34, at 17.)  Afremov contends that "Jarayan alleges a right to a one-third interest in the property, a right he still possesses."  (Id.)  Afremov further argues that "Defendants do not allege that they ever had any possessory right to the items at issue, and they do not allege that they no longer own an interest in" the items.  (Doc. No. 47, at 10.)  He also reiterates his

13

position that he did not acquire the entire interest in the items, arguing that "Defendants have not alleged that there was anything unlawful about Afremov's purchase of two thirds interest in" the items.  (Id.)

Defendants contend that Atzbach, although having agreed that he would not transfer the items "without Defendants' consent," nevertheless "transferred the items without Defendants' consent, sold them to Afremov, and [only] told Defendants about the sales after the fact."  (Doc. No. 44, at 15.)  They further argue that "Afremov knew that these items were owned, in part, by Defendants," but that he obtained them without paying Jarayan in full.  (Id.)

Each side is partially correct and partially wrong.  There is no factual dispute that the items were acquired by Jarayan, Atzbach and another jointly, with the intent to sell them to a collector such as Afremov.  (Doc. No. 27, ¶ 215, at 44.)  Atzbach, who had sole possession of the items, then in fact sold them to Afremov.  Defendants allege that Atzbach agreed not to sell the jointly-owned items without Defendants' consent.  (Id. ¶ 18, at 64.)  Although Afremov seems to contend that he did not acquire Defendants' interest in the items, Atzbach's sale to Afremov apparently purported to transfer to Afremov the entire interest in those items, not just Atzbach's interest, insofar as Afremov paid Atzbach in full for his one-third interest ($200,000), but paid Jarayan only $100,000 for his one-third interest.  There would, of course, be no reason to pay Jarayan anything had Afremov not understood that Jarayan had held a partial interest in the items.

Although Defendants argue that "Afremov knew that these items were owned, in

14

part, by Defendants," they cite to no allegation to that effect and, of course, would not necessarily be in a position to assert what Afremov knew about the joint ownership of the items.  But Afremov's partial payment to Jarayan strongly suggests that he knew Jarayan owned some interest in those items.  If, in fact, Afremov knew that Defendants owned a partial interest in the items, but did not pay them in full for them, Afremov's acquisition might constitute conversion insofar as he thus interfered with Defendants' partial ownership of the items.  Afremov's argument that Jarayan lacked "any right to the use and possession of the items," presumably because all of the owners agreed that Atzbach would retain possession, is irrelevant.  Insofar as Jarayan partially owned the items, he was entitled to his full share of the proceeds upon Atzbach's sale of the items to Afremov, regardless of whether Jarayan possessed the jointly-owned property.[6]

In short, on the face of the pleadings, the Court may not resolve these factual issues and thus may not dismiss Defendants' counterclaim for conversion.  For much the same reason, the Court may not grant Afremov's motion to dismiss Count Nine, which alleges that Afremov and Atzbach conspired to deprive Jarayan of his full share of the proceeds of the sale from Atzbach to Afremov.

---

[6]     Defendants also have asserted a claim against Atzbach for having sold the items to Afremov.  In Count Two, they frame this as one for breach of an oral contract "not to transfer or sell the items to a third party without Defendants' permission." (Doc. No. 27, ¶ 18, at 64.)  And in Count Seven, Defendants frame this claim as one for conversion.  (Id. ¶¶ 55-56, at 70.)  Having disposed of Defendants' one-third interest in the items without obtaining full payment for Defendants' interest, Atzbach might also have converted Defendants' property interest.

### 2.      Motion to Clarify Allegations and Parties

Afremov also argues, in the alternative, that if the Court does not dismiss all of the counterclaims he challenges, the Court should "require Defendants to identify which allegations relate to which entities, parties, or non[-]parties." (Doc. No. 34, at 19.) Afremov contends that Defendants "have lumped together several entities, many of which are not parties to this action." (Id.) Afremov cites Paragraph 10 of the Counterclaim as evidence that he cannot "even begin to reasonably prepare a response" because he "cannot even tell to whom the allegation is pertaining." (Id. at 20.) Paragraph 10 asserts that Jarayan incorporated his business under the name Eastern European Art Gallery Inc., but that any references to the "seller of an item" include not only that gallery, but also Masterpieces Art Gallery, and Defendant Object of Vertu, LLC. (Doc. No. 27, ¶ 10, at 13.) But as the Counterclaims also clarify, Eastern European Art Gallery Inc., and Masterpieces Art Gallery are simply two of Jarayan's other businesses, although, unlike Object of Vertu, not named by Afremov as Defendants. And as Defendants assert, "Paragraph 10 specifically relates solely to references to sales." (Doc. No. 44, at 18.) Whatever minimal confusion or burden this might impose on Afremov is not sufficient to grant the relief he requests.

### 3.      Motion To Strike Certain Allegations

Afremov also moves to strike "many" of the 310 paragraphs of the Counterclaims because, for example, at least seventy-two of the "factual allegations related to Defendants' knowledge or intentions, transactions or communications purportedly

between" Atzbach and Defendants, allegations which are either immaterial to the claims

or for which "Afremov would clearly have no knowledge and which cannot even

remotely pertain to Defendants' claims against Afremov." (Doc. No. 34, at 21.)  He also

claims that many of the allegations "are clearly asserted solely to embarrass, annoy, or

prejudice" him.  (Id. at 22.)

        "The court may strike from a pleading an insufficient defense or any redundant,

immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Motions to strike

under Rule 12(f) "are viewed with disfavor and are infrequently granted."  Lunsford v.

United States, 570 F.2d 221, 229 (8th Cir. 1977) (concluding that a motion to strike will

be denied "if the defense is sufficient as a matter of law or if it fairly presents a question

of law or fact which the court ought to hear").

        Here, the example Afremov provides, an allegation that he was purchasing art

from other dealers as well as other valuables, is not clearly immaterial or impertinent,

much less scandalous.  Defendants contend the allegation shows "how Afremov handles

his finances."  (Doc. No. 44, at 21.)  The other allegations Afremov challenges, those

pertaining to purchases for which he paid in full, are at most possibly unnecessary, but

not proffered to annoy or embarrass.  In sum, the Court denies the motion to strike.

        **C.     The Third-Party Complaint**

        Atzbach moves to dismiss the Amended Third-Party Complaint against him for

lack of personal jurisdiction, arguing largely that he lacks the minimum contacts with

Minnesota necessary for this Court to exercise jurisdiction over him.  (Doc. No. 36.)[7]

In addition, Atzbach contends that the Third-Party Complaint is improper under Rule 14 because it does not seek contribution or indemnification.  (Doc. No. 38, at 12.) He also contends that the *Amended* Third-Party Complaint is invalid for the same reason even though it adds a claim for contribution or indemnification.  Finally, he argues, in the alternative, that if the Court does not dismiss those Third–Party Complaints in their entirety, the Court should require Defendants "to identify which allegations related to which entities, parties, or non[-]parties."  (Doc. No. 38, at 20.)

In addition, Afremov too seeks to dismiss the Third-Party Complaint because it "does not seek contribution or indemnity from Atzbach for the claims of Plaintiff against Defendants."  (Doc. No. 34, at 23-25.)[8]  Afremov clarifies that this part of his motion

---

[7]        Atzbach also argues that, although he concedes that he was personally served with the initial Third-Party Complaint, a summons has not been issued for, and he was not personally served with, the *Amended* Third-Party Complaint.  (Doc. No. 38, at 1-2.)  But if a party was validly served with the original pleading and is thereafter represented by counsel, there is no requirement that he be personally served with an amended pleading.  Fed. R. Civ. P. 5(b); D. Minn. L.R. 5.4.  Atzbach's final jurisdictional argument is that service of the original Complaint on him in the State of Washington "failed to establish personal jurisdiction over [him] as it was not effected within 100 miles from Minnesota," where the summons was issued.  (Id. at 5.)  But here, any argument that service was defective for being accomplished outside of the 100-mile "bulge" provision of Rule 4(k)(1)(B) is misplaced.  Service under Rule 4(k)(1)(B) is an alternative to service under Rule 4(k)(1)(A), which simply requires that the defendant be "subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located."  Fed. R. Civ. P. 4(k)(1); 4B Wright & Miller, Federal Practice and Procedure § 1127, at 260-63 (3d ed. 2002).  Here, as will be explained, such service was valid.

[8]        As noted above, the portion of Afremov's Complaint regarding his acquisition of Russian artifacts (as opposed to that portion concerning the Armenian casino) asserts two counts against Defendants, one claim for breach of fiduciary duty, and
                                                                    continue...

addresses only the original Third-Party Complaint because he contends that the Amended

Third-Party Complaint "has not been personally served" on Atzbach.  (Id. at 23 n.3.)

But the *amended* pleading does expressly include a claim for "Contribution and

Indemnification," and was filed specifically to add such a claim.  (Doc. No. 27, at 61-64.)

And "[i]t is well-established that an amended complaint supercedes an original complaint

and renders the original complaint without legal effect."  In re: Atlas Van Lines, Inc., 209

F.3d 1064, 1067 (8th Cir. 2000).  Thus, Afremov's motion to dismiss the original Third-

Party Complaint is denied as moot.  Whether the last-minute addition to the Amended

Third-Party Complaint is sufficient to support Rule 14 impleader will be addressed with

respect to Atzbach's motion to dismiss.

## 1.     Personal Jurisdiction Over Third-Party Defendant Atzbach

Atzbach first argues that the Court lacks personal jurisdiction over him.  Here, on a

motion to dismiss, Third-Party Plaintiffs need make "only a *prima facie* showing of

jurisdiction" and this Court views "the evidence in the light most favorable" to

Defendants as the parties asserting jurisdiction with respect to their third-party claims.

Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG, 646 F.3d 589, 592 (8th

Cir. 2011).[9]

---

[8]...continue
one claim for unjust enrichment.  (Doc. No. 1, ¶¶ 66-75.)

[9]        "Nevertheless, '[t]he party seeking to establish the court's in personam
jurisdiction carries the burden of proof, and the burden does not shift to the party
challenging jurisdiction.'"  Id. (quoting Epps v. Stewart Info. Servs. Corp., 327 F.3d 642,
647 (8th Cir. 2003)).  If Defendants cannot substantiate their jurisdictional allegations with
continue...

Atzbach contends that as a resident of the State of Washington, who conducts his business as a dealer in Russian artifacts in and from that State, and who lacks any business presence in Minnesota, he is beyond the jurisdiction of this Court.  (Doc. No. 38, at 2-4.)  In response, Defendants argue that Atzbach's "numerous, significant and continuous contacts with Minnesota" permit this Court to "exercise both general and specific jurisdiction over him."  (Doc. No. 43, at 17.)

It is clear that Defendants, despite this conclusory legal allegation, can not establish *general* personal jurisdiction over Atzbach–which would permit the Court to adjudicate any claim against Atzbach–as there is no factual basis to conclude that his domicile was Minnesota or that any of his businesses could be "fairly regarded as at home" in Minnesota.  Goodyear Dunlop Tires Operations, S.A. v. Brown, ___ U.S. ___, 131 S. Ct. 2846, 2853-54, 2855-57 (2011).[10]  Defendants acknowledge that Atzbach is a resident of the State of Washington and conducts his antique dealership business from that State.  (Doc. No. 27, ¶¶ 15-16, at 13-14.)  There are no allegations that Atzbach

_____

[9]...continue
evidence, Atzbach may of course renew his personal jurisdiction argument following discovery.

[10]     In this diversity action, this Court may exercise personal jurisdiction over a non-resident such as Atzbach only if Minnesota's long-arm statute applies and the exercise would comport with the Due Process Clause.  E.g., Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG, 646 F.3d 589, 593 (8th Cir. 2011).  Because the Minnesota Supreme Court has construed the State's long-arm statute to extend to the full reach of due process, the inquiry becomes a question of whether Atzbach has the requisite minimum contacts with the State such that the exercise of jurisdiction over him would not offend traditional notions of fair play and substantial justice.  Juelich v. Yamazaki Mazak Optonics Corp., 682 N.W.2d 565, 570 (Minn. 2004).

maintains any business presence in Minnesota–for example, that Atzbach is licensed or

authorized to do business in Minnesota, has agents or employees in Minnesota, or

maintains an office, telephone number, mailing address or bank accounts in

Minnesota–and Atzbach disavows the existence of any such contacts.  (Doc. No. 38, at 2-

4; Doc. No. 37, ¶ 10).)

      With respect to *specific* personal jurisdiction–which permits a more limited reach

of jurisdiction extending only to those claims arising out of or related to the non-

resident's contacts with the forum–the governing test remains "purposeful

availment"–"whether there was 'some act by which the defendant purposefully avail[ed]

itself of the privilege of conducting activities within the forum State, thus invoking [its]

benefits and protections.'"  Goodyear Dunlop Tires Operations, ___ U.S. at ___, 131 S.

Ct. at 2854 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).  Accord J. McIntyre

Machinery, Ltd. v. Nicastro, ___ U.S. ___, 131 S. Ct. 2780, 2787 (2011) ("As a general

rule, the sovereign's exercise of power requires some act by which the defendant

'purposefully avails itself of the privilege of conducting activities within the forum State,

thus invoking the benefits and protections of its laws.'") (Kennedy, J.) (plurality).

      Defendants allege that Jarayan learned of Atzbach's business in August 2007 at an

antiques show in Baltimore, Maryland.  (Doc. No. 27, ¶ 14, at 13.)  In the fall of 2007,

Afremov purchased an item from one of Jarayan's businesses.  Afterwards, Afremov

contacted Jarayan inquiring whether Jarayan had other Russian antiques for sale.  Jarayan,

in turn, contacted Atzbach.  Jarayan then forwarded to Afremov photographs and other

information obtained from Atzbach.  Jarayan purchased several items from Atzbach's website and then sold them to Afremov.  The Court agrees that this alone would not support personal jurisdiction over Atzbach in Minnesota.

But Atzbach then became more directly involved with sales to Afremov.  Jarayan first met Atzbach in January 2008 at an antiques show in Miami, Florida.  (Id. ¶¶ 67, 70.) Jarayan purchased from Atzbach a number of items for Afremov.  (Id. ¶ 73.)  This practice continued after the Miami show.  (Id. ¶ 78.)  In April 2008, Jarayan went to New York City to purchase items at auction for Afremov.  Atzbach agreed to assist Jarayan in evaluating the auction items.  For the first time, Atzbach learned the actual identity of the person for whom Jarayan was purchasing items.  (Id.  ¶¶ 88-89.)

At two New York auctions, Atzbach won various items that he invoiced directly to Afremov.  (Id.  ¶¶ 99, 102.)  Although Atzbach previously shipped to Jarayan the items purchased for Afremov, after the New York auctions, for the first time Atzbach made a direct shipment to Afremov.  (Id. ¶ 114.)

In late April 2008, Afremov attended an antiques show in Chicago, Illinois at Atzbach's insistence.  Afremov purchased numerous items from Atzbach.  (Id. ¶ 118.) Atzbach wanted to be the exclusive seller to Afremov.  (Id. ¶ 127.)  After the Chicago show, Atzbach began shipping and invoicing all of the items sourced from him directly to Afremov.  (Id. ¶ 129.)  "Atzbach continued to sell major quantities to Afremov."  (Id. ¶ 134.)

Through the summer and fall of 2008, Atzbach continued to sell items to Afremov.

(<u>Id.</u> ¶ 210.)  In November 2008, Atzbach purchased a number of items at a London auction, anticipating that he could resell them to Afremov.  (<u>Id.</u> ¶ 214.)  Afremov, who had fallen behind on paying for all of his acquisitions, however, was not returning Atzbach's telephone calls until January 2009.  That month, "Atzbach traveled to Minnesota to visit Afremov in an attempt to collect the sums owed to him."  (<u>Id.</u> ¶ 219.) "While in Minnesota, Atzbach sold about $700,000" of antiques to Afremov.  (<u>Id.</u> ¶ 220.) But Afremov "was unable or unwilling to make" periodic payments to Atzbach.  (<u>Id.</u> ¶ 223.)

"In early February 2009, Jarayan and Atzbach flew to Minnesota to meet Afremov at Afremov's request."  (<u>Id.</u> ¶ 224.)  "While in Minnesota, Jarayan and Atzbach evaluated Afremov's collection of" antiques "to determine what items could be sold to help liquidate Afremov's debts to Jarayan and Atzbach."  (<u>Id.</u> ¶ 227.)  In April 2009, Afremov purchased another item from Atzbach for $600,000.  (<u>Id.</u> ¶ 229.)

This pattern of commercial behavior plainly establishes that Atzbach, at least from the time he learned of Afremov's identity and began selling and shipping items directly to him in Minnesota, purposefully availed himself of doing business with a Minnesota resident.  Although Atzbach was brought into the picture by Jarayan and, at first, was not aware of Afremov's identity, Atzbach soon learned of Afremov's identity and place of residence.  Moreover, the parties' commercial relationship was hardly confined to a single transaction, but rather extended over a period of several months during which Atzbach acquired artifacts on an ongoing basis for Afremov.  Atzbach concedes he had a business

relationship with Afremov and that he shipped the artifacts he acquired for Afremov to his residence in Minnesota.  (Doc. No. 37, ¶ 11.)  Not only did Atzbach directly invoice and ship artifacts to Afremov in Minnesota, Atzbach also traveled to Minnesota to facilitate the parties' commercial relationship.  Finally, this is not a products liability case where the non-resident manufacturer has simply placed goods into the "stream of commerce" that then ended up in Minnesota through the actions and decisions of intermediary distributors.  Atzbach shipped the artifacts he acquired for Afremov directly to Minnesota.

Because the various claims of Defendants arise out of Atzbach's sales to Afremov in Minnesota as alleged in the Amended Third-Party Complaint, the motion to dismiss is therefore denied insofar as it seeks dismissal for lack of specific personal jurisdiction.

## 2.      Validity of Third-Party Action

Atzbach also moves to dismiss both Third-Party Complaints in their entirety, the original version because it lacked any claim for contribution or indemnity, and the amended version because, despite Defendants having added such a claim expressly entitled "Contribution and Indemnification," Atzbach contends that the newly-added claim fails to state a claim for which relief may be granted.  (Doc. No. 38, at 12-14.) Besides that new claim (Count One), the Amended Third-Party Complaint asserts the following:  (1) breach of oral contract (Count Two), (2) tortious interference with contract (Count Three), (3) tortious interference with prospective economic relationships (Count Four), (4) unjust enrichment (Count Five), (5) promissory estoppel (Count Six), (6)

conversion (Count Seven), (7) civil conspiracy (Count Eight), and (8) breach of an implied covenant of good faith and fair dealing (Count Nine).  (Doc. No. 27, at 61-72.)

Although Afremov has chosen not to bring this action against Atzbach, Atzbach was indisputably involved in the acquisition of the artifacts for Afremov.  On the face of the pleadings, the Court is presently unable to conclusively exclude Atzbach from potential common liability to Afremov as Defendants have alleged in Count One of their Amended Third-Party Complaint.  But the other eight claims do not permit any common liability to Afremov.

A defendant may "serve a summons and complaint on a nonparty who is or may be liable to [the defendant] for all or part of the claim against [the defendant].  Fed. R. Civ. P. 14(a)(1).  A third-party complaint may be asserted "only when the third party's liability is in some way dependent on the outcome of the main claim or when the third party is secondarily liable to the defending party."  6 Charles Alan Wright, et al., Federal Practice and Procedure § 1446, at 413-15 (3d ed. 2010).  A third-party complaint is thus proper where the claim is one, for example, for "indemnity, subrogation, [or] contribution."  Id. at 418-21.  Such a claim "must be based upon plaintiff's claim against defendant.  The crucial characteristic of a Rule 14 claim is that defendant is attempting to transfer to the third-party defendant the liability asserted against defendant by the original plaintiff."  Id. at 430-32.  But "[t]he mere fact that the alleged third-party claim arises from the same transaction or set of facts as the original claim is not enough."  Id. at 432-34.  Under the current version of Rule 14, "a judgment against the third-party defendant must inure to

the benefit of the third-party plaintiff, and not the original plaintiff; defendant no longer

may implead someone who is solely liable to plaintiff." Id. at 445-46. "In other words, a

third-party may be impleaded only on the grounds that it is liable to the *defendant* and not

on the ground that it, as well as the original defendant, may be liable *to the plaintiff*."

Murray v. Reliance Ins. Co., 60 F.R.D. 390, 391 (D. Minn. 1973) (emphases in original).

Moreover, impleader under Rule 14 "is proper only when a right to relief exists

under the applicable substantive law." Id. at 435. "Thus, in a diversity case such as this

one, joinder of third-party defendants depends on the existence of a state-created liability

between the defendant[s] and the third party." Murray v. Reliance Ins. Co., 60 F.R.D. at

392. Under Minnesota law, "[c]ontribution requires, first, a common liability of two or

more actors to the injured party, and second, payment by one of the actors of more than

its fair share of the common liability." City of Willmar v. Short-Elliott-Hendrickson,

Inc., 512 N.W.2d 872, 874 (Minn. 1994). Indemnity may apply where, for example, "a

party fails to discover or prevent another's fault and, consequently, pays damages for

which the other party is primarily liable." Id. With respect to contribution, "[c]ommon

liability exists if two defendants are independently liable to the plaintiff for the same

damages." Johnson v. Serra, 521 F.2d 1289, 1297 (8th Cir. 1975.)

Here, because Atzbach had nothing to do with the casino project, Defendants may

implead him only with respect to the artifact transactions. Regarding that dispute,

Afremov alleges that Defendants breached their fiduciary duty to him by "acting in their

own self interest," by failing "to disclose to Afremov that a more advantageous price

could be procured for the purchase of the" artifacts, and by failing "to disclose to Afremov the secret profits they received from the sellers of the" artifacts that Defendants then sold to Afremov.  (Doc. No. 1, ¶ 68.)  Afremov alleges that Defendants received "commissions from the sellers of the Russian silver, which commissions increased the costs of the silver to Afremov."  (Id. ¶ 37.)  Afremov also alleges that Defendants were unjustly enriched by retaining profits from the transactions by receiving commissions from Afremov "in reliance upon Jarayan's representations that Defendants were being compensated for the transactions by Plaintiff only and that the prices at which they were securing the silver were the best possible prices available."  (Id. ¶ 72.)

Thus, while it is beyond dispute that Jarayan and Atzbach worked together to acquire artifacts for Afremov, and that the three have various disputes with respect to those transactions, the mere fact that the alleged third-party claims arise from the same transaction or set of facts as the original claim is not enough.  Defendants may not implead Atzbach unless he could be jointly liable to Afremov for the particular claims he alleges with respect to the artifact transactions–essentially that Jarayan failed to act in Afremov's best interests by not acquiring the artifacts at the lowest possible prices.

(a)     **Count One**

In Count One of the Amended Third-Party Complaint, Defendants allege that "Atzbach is or may be liable to Defendants for part of Afremov's claims against Defendants.  Because Afremov's lawsuit against Defendants seeks to adjudicate Afremov's rights against Defendants for alleged fraud and unjust enrichment . . ., the

issue of Atzbach's contribution to and/or indemnification of Defendants may and should

be adjudicated in this original action under Rule 14."  (Doc. No. 27, ¶ 9, at 62.)

Defendants allege that any liability to Afremov "is a common liability between Jarayan

and Atzbach" for "part or all of the same damages."  (<u>Id.</u> ¶ 13, at 63.)  Defendants further

allege that "to the extent that Jarayan has any liability to Afremov . . ., Jarayan has only a

derivative or vicarious liability and would be paying damages for which Atzbach is

primarily liable and therefore Jarayan would be entitled to indemnification from

Atzbach."  (<u>Id.</u> ¶ 14.)

     The Court recognizes that Defendants amended their Third-Party Complaint to add

these allegations, as part of their express claim for "Contribution and Indemnification,"

only after Afremov and Atzbach first challenged Defendants' original third-party action

as improper.  Nevertheless, on a motion to dismiss, this Court must accept as true all

factual allegations in discerning whether the claims are plausible.  At this juncture of the

proceedings, it is plausible that Atzbach could be liable in part for some of the damages

Afremov seeks solely from Defendants with respect to the artifact transactions.

Defendants allege that

> Atzbach made representations directly to Afremov about the price and
> quality of the items, whether the price was the "lowest possible," whether
> the price to Afremov was the price at which Atzbach and/or Defendants had
> procured the item, and whether Atzbach or Defendants were receiving
> commissions from someone other than Afremov.

(Doc. No. 27, ¶ 10, at 62.)  Whether Atzbach, alone or in conjunction with Defendants, in

fact thereby inflated the price Afremov paid, and did so to their own benefit, remains to

be proven, but on the face of the pleadings the Court presently can not eliminate the possibility as a matter of law that Atzbach could be jointly liable to Afremov.  If Defendants are not able to substantiate their allegations regarding contribution or indemnity through discovery, Atzbach may renew his present arguments on summary judgment.

### (b)    Counts Two Through Nine

With respect to the other eight claims of the Amended Third-Party Complaint, several, namely Counts Two, Five, Six, and Seven, are premised to some degree on the allegation that Atzbach was involved with Defendants "jointly" in the acquisition of artifacts for Afremov.  (Id. ¶¶ 18-19, 42, 50, 55-56, 65.)  But none of them plausibly alleges a claim that Atzbach might be jointly liable with Defendants on either of Afremov's claims regarding the artifact transactions.  Thus, none of the remaining eight additional claims is a proper third-party claim under Rule 14.

Count Two alleges that Atzbach breached an oral contract with Defendants under which those parties agreed (1) that Atzbach would pay a commission to Defendants for direct sales that Atzbach made to Afremov, and (2) to purchase artifacts jointly for resale to Afremov.  (Doc. No. 27, ¶ 18, at 64.)  Atzbach's potential liability on this claim is unrelated to Afremov's claims that Defendants failed to acquire the artifacts at the lowest possible prices.  Whether Atzbach paid Defendants a commission for his sales to Afremov is a separate question from whether Atzbach and Defendants, for example, inflated the cost to Afremov by receiving commissions from the sellers, the cost of which

the sellers then added to the price Atzbach and Defendants, and in turn Afremov, paid for the artifacts.

Count Three, alleging that Atzbach tortiously interfered with Defendants' contract with Afremov, and Count Four, alleging that Atzbach tortiously interfered with Defendants' prospective economic relationships with Afremov, likewise would not expose Atzbach to any common liability with Defendants towards Afremov. Rather, prevailing on such claims could only render Atzbach liable to Defendants for wrongdoing that is unrelated to Afremov's claims against Defendants.

Similarly, Count Five, which alleges that Atzbach has been unjustly enriched by retaining funds owed to Defendants as and for sales proceeds and commissions in conjunction with Afremov's purchase of antiques directly from Atzbach, is not related to or contingent upon Afremov's claims against Defendants for not obtaining the artifacts at the lowest possible prices. Likewise, Count Six, which alleges that Atzbach is estopped from denying his promises to Defendants to, for example, pay them commissions on items that Afremov purchased directly from Atzbach, would impose liability on Atzbach directly to Defendants independent of any liability Defendants would have to Afremov.

Count Seven, alleging that Atzbach converted certain items owned jointly by himself, Defendants, and another (not a party to this action), likewise has nothing to do with Afremov's allegations that Defendants failed to acquire the artifacts at the lowest possible prices. Similarly, Count Eight, alleging that Afremov and Atzbach conspired to misappropriate certain artifacts jointly owned by Atzbach, Jarayan and another, also

could not expose Atzbach to any common liability with Defendants towards Afremov.

Finally, Count Nine, alleging various breaches of an implied covenant of good faith and fair dealing, simply repackages the allegations of Counts Two through Eight under the label of a different claim.  (Doc. No. 27, ¶¶ 64-65, 69, at 71-72 (re-alleging that Atzbach failed to pay commissions to Defendants, and converted property jointly owned with Defendants).)

In sum, any liability that Atzbach might have to Defendants on Counts Two through Nine would not constitute a claim by Defendants for contribution on their alleged liability to Afremov.  But as long as evidence disclosed in discovery substantiates that Count One is a valid claim for contribution or indemnity, the other eight claims of the Amended Third-Party Complaint may remain in this action.  Under Rule 18(a), as relevant here, "[a] party asserting a . . . third-party claim may join, as independent or alternative claims, as many claims as it has against an opposing party."  Fed. R. Civ. P. 18(a).  Here, the Court has concluded that, on the face of the pleadings, Count One might state a valid third-party claim for contribution or indemnification.  "Once a court has determined that a proper third-party claim has been asserted, it should allow joinder of any other claim the third-party plaintiff may have against the third-party defendant."  6 Charles Alan Wright, et al., Federal Practice & Procedure § 1452, at 485 (3d ed. 2010).[11]

Finally, Defendants' and Atzbach's requests for an award of fees and costs

---

[11]     Atzbach also argues that if the Court does not dismiss the third-party action in its entirety, it should "require Jarayan to identify which allegations relate to which entities, parties, or non parties."  (Doc. No. 38, at 20.)  The Court, however, already has rejected the very same argument asserted by Afremov.  See supra Section II.B.2.

incurred with respect to their motions are denied.

## III.    ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      Plaintiff's motion to dismiss Defendants' Counterclaims and Third-Party

Complaint [Doc. No. 33] is **GRANTED IN PART** (insofar as it seeks dismissal of a part

of Count One, the part of Count Two Plaintiff challenges, and Counts Five, and Seven),

**DENIED IN PART** (insofar as it seeks to dismiss the other part of Count One, as well as

Counts Eight and Nine, to clarify the pleadings, and to strike certain allegations) and

**DENIED AS MOOT IN PART** (insofar as it seeks to dismiss the original Third-Party

Complaint); and

2.      Third-Party Defendant John Atzbach's motion to dismiss the Third-Party

Complaint [Doc. No. 36] is **DENIED** (without prejudice to its renewal if Third-Party

Plaintiffs are unable to substantiate their claim for contribution or indemnity).


Dated:   March 28, 2012                          ___ s/ Susan Richard Nelson ___
                                                 SUSAN RICHARD NELSON
                                                 United States District Judge